Howard A. Levine, J.
In March, 1975, police officers dressed in civilian clothes entered the "Peek-a-Boo” Book Store in the City of Schenectady, on several occasions, and, without revealing their official purpose or authority, purchased magazines from the defendant, which he voluntarily sold to them. No arrests were made at the times of sale. Subsequently, these magazines were presented to a Schenectady County Grand Jury which returned indictments against the defendant for obscenity in the second degree, arising out of those sales. The defendant was arrested on bench warrants issued pursuant to each of the indictments.
The defendant has moved to dismiss the indictments on the ground that constitutionally, a prior judicial determination of obscenity had to be made before any criminal proceedings could have been initiated against him.
The Supreme Court’s decision in Roth v United States (354 US 476) heralded an era in which the court became increasingly involved in constitutional litigation over the efforts of State and Federal authorities to suppress and prosecute the dissemination of materials dealing explicitly with sex. Roth and its progeny mainly involved the application of the court’s evolving definition of obscenity. The Supreme Court’s repeated efforts to formulate a predictable and workable guideline for criminal prosecution or censorship were often confusing and lacking in unanimity.[1] At least two principles, however, were firmly established from Roth to the most recent pronouncement in Miller v California (413 US 15). First, portrayals of *140 sexual matters falling within the definition of obscenity are not entitled to any constitutional protection. But, secondly, any such portrayals, whether in books, pictures, magazines or films, that do not fall .within the constitutional definition are entitled to the full scope of protection of freedom of speech and of the press under the First Amendment.
The doctrine requiring prior judicial scrutiny, invoked by ' the defendant here, had its genesis in a series of cases addressed not to the definition of obscenity, but to the procedures used by law enforcement officials to suppress allegedly obscene materials. It can be viewed as a by-product of the vagueness of the definition and the difficulty in its practical application. The first of these cases, Marcus v Search Warrant (367 US 717), tested Missouri’s civil statutory procedure for the seizure and destruction of obscene materials. The police signed complaints containing conclusory allegations concerning the obscene nature of unnamed publications located at six premises. Based on these applications, the State court issued warrants directing the seizure of any and all "’obscene publications’” at the specified premises. In executing the warrants, the police took into their possession an aggregate of some 11,000 copies of 28 different publications. The Supreme Court ruled (p 731) that the seizures in Marcus were in violation of the defendants’ First and Fourth Amendment rights, not on the merits of the nature of the books but because "Missouri’s procedures as applied in this case lacked the safeguards which due process demands to assure nonobscene material the constitutional protection to which it is entitled. What the court found objectionable was that it was left to the individual judgment of the various police officers involved in the search to determine what to seize as obscene. "There was no step in the procedure before seizure designed to focus searchingly on the question of obscenity” (p 732). The court suggested that with the kind of mass seizure involved in Marcus a prior hearing by a neutral, detached Magistrate was required.
In A Quantity of Books v Kansas (378 US 205), the court made more explicit its intention to impose judicial control over seizure procedures in order to avoid the danger of prior restraint against constitutionally protected nonobscene portrayals of matters dealing with sex. The warrant in Quantity of Books was not lacking in specificity, as was the warrant in Marcus. It named 59 specific titles of books to be seized. Of the named books, however, only seven were attached to the sup *141 porting affadavit, and the remainder were merely referred to in very general terms. Some 1,715 copies of the 59 publications were seized pursuant to the warrant. The Supreme Court reversed and vacated the seizure on the grounds that it constituted a prior restraint, which can only be accomplished after a full adversary hearing on obscenity. Otherwise, "there is danger of abridgement of the right of the public in a free society to unobstructed circulation of nonobscene books” (p 213).
Subsequently, both the Supreme Court and the Federal Courts of Appeals have extended the requirement of a prior judicial determination to seizure of a single film being shown commercially, on the grounds that the seizure of a film, having a potential audience equal to the seating capacity of the theatre multiplied by the number of potential showings, is akin to a mass seizure of books. (See Lee Art Theatre v Virginia, 392 US 636; Bethview Amusement Corp. v Cahn, 416 F2d 410 [2d Cir., 1969]; and Roaden v Kentucky, 413 US 496.) However, Heller v New York (413 US 483) established that the hearing may be held ex parte, and left open the question as to whether the warrant might be issued on a finding of probable cause from a detailed description of the film by the applicant, rather than a viewing of the film by the Magistrate.
Certain generalizations can be made from examination of the cases: (1) A mass seizure of magazines or other published materials requires a prior adversary hearing before a judicial officer which will "focus searchingly” on the question of obscenity with respect to the materials seized. (2) A seizure of a single commercially shown film for evidentiary purposes in a subsequent criminal proceeding requires prior judicial scrutiny, which may be made ex parte provided that a prompt adversary hearing is subsequently afforded the defendant and there are safeguards to assure that the seizure will not interfere with continued exhibition of another copy during the pendency of the proceedings. (3) A seizure of printed material, photographs, or "stag movies” for evidentiary purposes in a subsequent criminal proceeding has not been reviewed by the Supreme Court, but decisions of lower Federal courts have applied the requirement of prior ex parte judicial review, unless exigent circumstances for immediate seizure exist, such as the danger of the destruction or removal of the evidence. (See Smith v United States, 505 F2d 824; and United States v Apple, 305 F Supp 330.)
*142 The rationale behind the foregoing requirements is clear. A confiscatory seizure, by law enforcement authorities, upon their determination of obscenity, effectively removes the works seized from public distribution. This represents the essence of a prior restraint upon expression, directly prohibited by the First Amendment under decisions beginning at least as early as Near v Minnesota (283 US 697). In such cases involving massive seizures, a full adversary hearing is required; nothing less would protect the public’s right "to unobstructed circulation of nonobscene books”. (A Quantity of Books, quoted supra, p 213.) A limited seizure of books, magazines or films for purposes of use as evidence is less directly obstructive of First Amendment rights and therefore does not require a prior, full adversary hearing. Nevertheless, absent unusual circumstances, it does require a judicially issued warrant, based on probable cause and particularly describing the "things to be seized.” This is because of the prohibition of the Fourth Amendment against unreasonable searches and seizures. The historical connection between the origin of the Fourth Amendment and the Crown’s suppression of printed political expression through the use of general warrants was described in Stanford v Texas (379 US 476, 485), in which Justice Stewart concluded: "In short, what this history indispensably teaches is that the constitutional requirement that warrants must particularly describe the 'things to be seized’ is to be accorded the most scrupulous exactitude when the 'things’ are books, and the basis for their seizure is the ideas which they contain.” Since books are not tangible instruments of a crime nor contraband, but represent at least partially the expression of ideas, a warrantless seizure incidental to arrest, or one made pursuant to a warrant either based upon conclusory allegations, or failing to specify what is to be seized, is "unreasonable” under the Fourth Amendment. (See Roaden v Kentucky, 413 US 496, supra.)
The foregoing analysis demonstrates that the requirement of prior judicial scrutiny is inapplicable to bar the indictments and subsequent arrests of the defendant in the instant case, where the initiation of the present criminal proceeding was based solely on the voluntary sale of magazines to undercover police officers. There is no prior restraint. Indeed, the procedures used by the police and prosecutor represent the opposite of a prior restraint, as described in Near v Minnesota (supra). Defendant is no more legally or physically restricted in his *143 distribution of magazines than if the sales for which he has been indicted were made to ordinary customers. Of course, the mere fact that defendant has been indicted and arrested for obscenity may inhibit him and others from selling the same or similar materials. But a three-Judge Federal District Court held that this "chilling effect” is not the kind of prior restraint prohibited by the First Amendment because "the first overt impact upon the allegedly protected area comes at a time when all the protections and favorable presumptions of the criminal process are available to the defendant.” (Milky Way Prods. v Leary, 305 F Supp 288, 297 [SDNY, 1969], affd 397 US 98.)
The minimal effect of defendant’s indictment and arrest upon his and the public’s First Amendment rights hardly justifies the serious limitation on the power of grand juries which a requirement of prior judicial scrutiny would impose. The right of the Grand Jury to make inquiry into the commission of crime within its county and to initiate criminal proceedings independent even of the views of the court which impanelled it is sanctioned under the New York State Constitution (art. I, § 6; see People v Stern, 3 NY2d 658).[2]
The Federal courts have refused to interpret the line of Supreme Court decisions relied upon by the defendant as thus limiting the prosecution of obscenity cases directly by indictment when no seizure was involved. (See United States v Young, 465 F2d 1096; Miller v United States, 431 F2d 655; United States v Gundlach, 345 F Supp 701; and United States v Lethe, 312 F Supp 421.) By way of dictum, New York’s Federal Court of Appeals has taken the same view in United States v Wild (422 F2d 34), where a seizure for evidentiary purposes took place incidental to bench warrant arrests after indictment. The court stated (p 38): "We do not believe Marcus and Quantity of Books can be read to proscribe the application of the ordinary methods of initiating criminal prosecution to obscenity cases.” Nor can defendant invoke the Fourth Amendment to require prior judicial scrutiny, simply because there was no seizure in any constitutional sense when *144 he voluntarily sold the magazines to the undercover agents. As succinctly put by the court in United States v Lethe (supra, p 422): "However, where a defendant has voluntarily parted with literature or films, as in the instant case, he cannot complain of a suppression when he is later prosecuted. I conclude that no judicial determination is required prior to trial.”
For the foregoing reasons I conclude that in this case no prior judicial scrutiny of the magazines was constitutionally required before the defendant was indicted and arrested, and therefore defendant’s motion to dismiss on this ground must be denied.

. See the discussion of the history of the attempts to define obscenity in the dissenting opinion of Brennan, J., Paris Adult Theatre I v Slaton (413 US 49, 78-93).

. CPL 190.65 requires evidence establishing a legally sufficient, prima facie case before a Grand Jury may indict. This appears to be a greater quantum of proof than probable cause. Thus, it may certainly be argued that the grand jury proceeding afforded the defendant at least the equivalent of the safeguards of an ex parte probable cause hearing before a Magistrate in "focussing searchingly” on the question of obscenity.